IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Eric Anderson ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 03 C 2689 |
| ) | |
| Don Hulick,[1] ) | |
| ) | |
| Respondent. ) | |

MEMORANDUM OPINION AND ORDER REGARDING
PETITION FOR WRIT OF HABEAS CORPUS

JAMES F. HOLDERMAN, Chief Judge:

Illinois prisoner Eric Anderson ("Anderson") filed a petition, on April 22, 2003, ("original petition") (Dkt. No. 1) and supplemental petition, on April 12, 2006, ("supplemental petition") (Dkt. No. 6) for habeas corpus relief under 28 U.S.C. § 2254. After fully considering the arguments raised and for the reasons stated below, the court denies his original and supplemental § 2254 petitions (Dkt. Nos. 1 & 6).

BACKGROUND

A. Criminal History

Anderson was convicted by a jury of two counts of First Degree Murder on May 22, 1998 and sentenced to a term of natural life imprisonment. The court recounts the underlying facts of the conviction, presuming unless rebutted by clear and convincing evidence that the state court's account of the facts is correct. *See* 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 547

---

[1] The court substitutes Don Hulick, the current acting warden of Menard Correction Center and thus Anderson's current custodian, as the proper party respondent. *See* Rules Governing § 2254, Rule 2(a); *Araujo v. Chandler*, 435 F.3d 678, 679 (7th Cir. 2005).

(1981). On December 14, 1995, five teenagers, Helena Martin, Carrie Hovel, Melissa Shibla, Peter Cassanas, and Bryan Adasiak, a gang member of the Ridgeway Lords, were in a parked minivan in what was considered the territory of a rival gang, the Almighty Popes. (Resp. Ex. C at 1, Order in *People v. Anderson*, No. 1-98-2438, (consolidated with 1-98-2390) (Ill. App. Ct., 1st Dist. Dec. 29, 2000)). Fifteen-year-old Anderson, a member of the Almighty Popes, along with Billy Bigeck, Edward Morfin and two other teenaged boys, approached the minivan. (*Id*. at 2.) According to Adasiak's testimony at Anderson's trial, the boy later identified as Bigeck, was carrying a stick or a baseball bat. (*Id*.) Adasiak also attested at trial that he witnessed another boy, later identified as Anderson, reach under his coat and pull out a gun. (*Id*.) Adasiak then heard a loud pop and saw a flash. (*Id*.). Several shots were fired into the minivan, resulting in the deaths of Hovel and Martin. (*Id*.) Adasiak related that he and Cassanas did not know the names of the teenaged boys, but that they had had a previous altercation a couple days earlier with both the shooter and the boy carrying the stick. (*Id*. at 2-3.)

Later that day, Cassanas and Adasiak were taken to the police station. (*Id*. at 2.) Adasiak provided physical descriptions of the three boys who approached the minivan, describing the shooter "as white, male around 16 or 17 years old, between 5'6" and 5'8", weighing between 130 and 140 pounds, wearing a black pullover jacket, possibly a White Sox starter jacket," and the individual carrying the stick or the bat "as white, male, 17 or 18 years old, between 5'10" and 6' tall, weighing 170 pounds, and wearing a dark blue Notre Dame jacket." (*Id*. at 3.) Because Adasiak had seen Bigeck wearing a Notre Dame jacket during the altercation several days earlier, Adasiak believed that the person carrying the stick or bat was Bigeck. (*Id*.) But Adasiak did not see the person's face. (*Id*.) The third teenaged boy was described "as white, male, 16 or 17 years old, 5'6" to 5'8" tall, hair shaved on the sides and either short or combed back on top,

wearing a dark jacket." (*Id.*)

Sometime after Cassanas and Adasiak gave statements to the police, Bigeck was brought down to the police station where he eventually confessed in a statement and identified Anderson as the shooter and Edward Morfin as the third individual. (*Id.* at 4.) At 7:30 a.m. on December 15, 1995, both Anderson and Edward Morfin's cousin Nicholas Morfin (who came to the attention of the police through another individual's statement) were brought to the police station and participated in a line up in pullover White Sox jackets. (*Id.* at 5.) Bigeck and Edward Morfin were also included in the line up along with another boy believed to have been involved with the shooting. (*Id.*). Adasiak immediately identified Anderson as the shooter. (*Id.*) Adasiak, however, could not positively identify Bigeck as being involved, even though he knew that Bigeck wore a Notre Dame jacket like one of the perpetrators, because Adasiak did not see the face of the individual wearing the Notre Dame jacket. (*Id.*) Adasiak could not identify anyone else. (*Id.*)

After the line up, Nicholas Morfin consented to a search of his home by the police officers. Once there, Nicholas Morfin revealed to the officers a .44 handgun and three live rounds of ammunition. (*Id.*) Bullet fragments and photographs of Nicholas Morfin and Anderson were also found. (*Id.*)

Nicholas's cousin, Edward Morfin, agreed to cooperate with the police officers, leading the officers to the murder weapon, a .357 Smith and Wesson handgun with five spent casings, an empty chamber, and the serial number scratched off. (*Id.* at 6.) The parties stipulated that a firearms expert would testify that the handgun was the murder weapon and "could also be traced back to the bullet jacket recovered from Nick Morfin's bedroom." (*Id.*) At the trial, a detective testified that both the .357 and the .44 handgun had been stolen from her house prior to

December 14, 1995. (Resp. Ex. A at 13, Appellant's Br. in *Anderson*, No. 1-98-2438.)

B. Pretrial and Trial Proceedings[2]

Anderson filed a motion to suppress Adasiak's identification from the line up, which was denied by the state trial court. The case proceeded to trial. As relevant here, several witnesses testified for the state beside Adasiak and Cassanas. Bigeck testified about the shooting and identified Anderson as the shooter. (*Id.* at 17.) A member of the Almighty Popes, Mike Bielawski testified that in a conversation with Nicholas Morfin, Edward Morfin, and Anderson, Anderson told Bielawski that they were going to "'f- - - with,' 'hit up' and 'do a burn on' the Ridgeway Lords' van." (Resp. Ex. B at 27, Appellee's Br. in *Anderson*, No. 1-98-2438..) Another member of the Almighty Popes, Joe Nemchausky, testified that Anderson and Bigeck arrived at his house the morning of the shooting and showed him two guns that they claimed they had stolen from a police officer. (Resp. Ex. A at 20; Resp. Ex. B. at 28.) Finally, Bryan O'Shea, also a member of the Almighty Popes, testified for the prosecution. (Resp. Ex. A at 14.) O'Shea attested that, earlier on the day of the shooting, he had been at a meeting with several other gang members and had seen Anderson and Bigeck with guns. (Resp. Ex. A at 14; Resp. Ex. B at 31) At the meeting, O'Shea related that Matt Sopron, the leader of the Almighty Popes, had directed Nicholas Morfin, Bigeck, and Anderson to take care of the Ridgeway Lords, which he understood to mean to shoot them. ((Resp. Ex. A at 14; Resp. Ex. B at 31.) Additionally, a gang specialist testified, describing the structure of gangs in Chicago and Anderson's specific affiliation. (Resp. Ex. C at 10-11.) After closing arguments, the jury found Anderson guilty of two counts of second degree murder.

---

[2]Anderson's case was transferred from juvenile court to the Illinois Circuit Court under 705 Ill. Comp. Stat. 405/5-4 (1996) (replaced by 705 Ill. Comp. Stat. 405/5-805 (2005)).

C. Post-Trial Motions and Events

Counsel for Anderson filed a post-trial motion upon learning that O'Shea had met with prosecutors two weeks before the trial and had told them that he did not remember anything about the events on December 14, 1995. (Resp. Ex. C at 20.) Counsel for Anderson argued that he would have used this information to impeach O'Shea's testimony. (*Id.*) The trial court conducted a post-trial hearing on the issue and concluded that, regardless whether the prosecution failed to disclose the events of the meeting with O'Shea before trial, the evidence at trial was so overwhelmingly against Anderson that O'Shea's testimony was immaterial. (*Id.* at 21.)

O'Shea also testified at the separate trial of Sopron in February 1998 that Sopron had directed Anderson and the others to shoot members of the Ridgeway Lords. (Pet. Ex. A at 6.) Sopron was convicted. On July 22, 2000, O'Shea met with counsel for Sopron and in a recorded statement recanted his testimony. (*Id.* at 1-7.) Specifically, O'Shea denied that he had ever heard Sopron direct anyone to kill the Ridgeway Lords. (*Id.* at 7.) O'Shea, however, reaffirmed that Anderson and Bigeck had shown O'Shea stolen guns on December 14, 1995 before the shooting occurred. (*Id.* at 12.) When asked why he committed perjury, O'Shea stated that he felt pressured and threatened to testify against Sopron by an Assistant State's Attorney, Scott Cassidy, in a meeting with Cassidy, O'Shea and O'Shea's attorney. (*Id.* at 33-36.) O'Shea then testified in Sopron's postconviction hearing on January 30, 2002 that he had lied when he testified at Sopron's trial that Sopron gave instructions to go after the Ridgeway Lords. (Pet. Ex. D.) Despite O'Shea's recantation, the postconviction court upheld Sopron's conviction. (Resp. Ex. K at 2, No. 1-04-1534, (Ill. App. Ct. July 22, 2005).) John Gizowski, who did not testify against Anderson, separately submitted an affidavit stating that Cassidy had pressured and

threatened them into testifying against Sopron. (Pet. Ex. B.) Edward Morfin also submitted an affidavit saying that "Cassidy made me fabricate testimony against Nick Morfin, Matt Sopron, Wayne Antusas, Eric Anderson, Nick Liberto, in which [sic] implicated these men in the deaths of Helen Martin and Carrie Hovel." (Pet. Ex. F.) The affidavit does not specifically identify statements by Edward Morfin that were fabrications. (*Id.*) It is not clear from the record whether Edward Morfin testified at Anderson's trial. (See Supp. Pet. at 9, Resp. Ex. C at 4 n.2, Resp. Ex. A at 10-30.)

C. Procedural History

The Illinois Appellate Court affirmed Anderson's conviction on December 29, 2000, and his petition for reconsideration was denied on November 27, 2001. Subsequently, Anderson's timely petition for leave to appeal to the Illinois Supreme Court was denied on April 25, 2002. Anderson did not petition the U.S. Supreme Court for a writ of certiorari, and so his conviction became final on July 24, 2002, *see* 28 U.S.C. § 2244(d)(1)(A); *Anderson v. Litscher*, 281 F.3d 672, 674 (7th Cir. 2002). Anderson filed a petition for post conviction relief in state court on April 8, 2003. Two weeks later, Anderson filed a petition under 28 U.S.C. § 2254 in federal district court. Anderson is represented by counsel before this court. The court stayed Anderson's petition for a period of 60 days after the termination of the state court proceedings, so that Anderson could fully exhaust his state remedies.

The state circuit court dismissed as untimely, and alternatively as lacking merit, Anderson's petition for postconviction relief on April 20, 2004. The state appellate court affirmed the dismissal of Anderson's postconviction petition on the grounds that the claims lacked merit on July 22, 2005, and the Illinois Supreme Court denied Anderson leave to appeal on December 1, 2005. Because Anderson failed to file a petition for a writ of certiorari to the

6

U.S. Supreme Court, the state court postconviction proceedings terminated on March 1, 2006. Anderson timely filed his motion to reinstate petition for writ of habeas corpus and supplemental petition on April 12, 2006.

Anderson presents five main arguments in his original petition for habeas corpus relief under § 2254. (1) Anderson contends that the line up from which he was identified as the shooter was suggestive and unduly prejudicial and that its admission violated due process. (2) Anderson challenges the trial court's refusal to exclude evidence of Anderson's gang membership as a violation of due process. (3) Anderson raises several arguments relating to alleged prosecutorial misconduct and the withholding of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). (4) Anderson argues that he was denied effective assistance of counsel because his counsel was prevented from presenting mitigating evidence by an Illinois statute mandating a term of life imprisonment for first degree murder convictions with multiple victims. (5) Finally, Anderson challenge's the trial court's reading an instruction on accountability liability.

In Anderson's supplemental petition under § 2254, Anderson expands his argument under *Brady* based on what he deems to be newly discovered evidence. In addition, Anderson challenges the postconviction court's failure to hold a hearing on the newly discovered evidence and denial of his request for a new trial.

## LEGAL STANDARDS

This court reviews with deference the state court's decision, only granting relief where the petitioner establishes that a state court's decision on a constitutional claim's merits is an unreasonable application of or contrary to clearly established federal law, as determined by the

Supreme Court. 28 U.S.C. § 2254(d); *see Smothers v. McCaughtry*, 418 F.3d 711, 713 (7th Cir. 2005). A state court decision is deemed contrary to clearly established federal law where a court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Ruvalcaba v. Chandler*, 416 F.3d 555, 560 (7th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)). An "unreasonable application" of established federal law occurs where the court cites to the correct legal rule or standard but applies that the rule or standard unreasonably to the circumstances of that case. *Id.* (citing *Williams*, 529 U.S. at 407-08). What this means is that a reviewing court may determine the court's decision to be substantively incorrect, but still uphold the decision so long as it is objectively reasonable. *Id.*

## ANALYSIS

A. Procedural Default

1. Supplemental § 2254 Petition

The state raises several procedural arguments against this court's consideration on the merits of Anderson's supplemental § 2254 petition. The state first argues that Anderson's supplemental § 2254 petition should be dismissed as untimely under Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations. *See* 28 U.S.C. § 2244(d). According to the state, Anderson's postconviction petition was not properly filed in state court since the state circuit court dismissed the postconviction petition as untimely and the state appellate court affirmed the dismissal (even though the circuit court and appellate court also addressed the merits of the claims). If the postconviction petition was not properly filed in state court, then AEDPA's one-year statute of limitations was not tolled and Anderson's supplemental

8

§ 2254 petition would be filed beyond the statutory one-year period. *See* 28 U.S.C. § 2244(d). Should that be the circumstance, the court could only consider the arguments in Anderson's supplemental § 2254 petition if they "related back" to the date of his original timely-filed § 2254 petition. *Mayle v. Felix*, 125 S. Ct. 2562, 2574-75 (2005). "Related back" means that the claims arise out of the same conduct, transaction, or occurrence. *Id.*

The court need not decide whether the supplemental § 2254 petition was timely filed. because the court concludes that the claims in Anderson's supplemental § 2254 petition relate back to those in his original § 2254 petition. The state incorrectly reads the original and supplemental § 2254 petitions. According to the state's interpretation, Anderson in the original § 2254 petition raised claims of prosecutorial misconduct stemming from the police and prosecutor's alleged misconduct at his line up, while the claims of prosecutorial misconduct in his supplemental § 2254 petition involve the prosecutor's alleged withholding of exculpatory statements by witnesses who testified at the trial. The court disagrees with the state's reading of the original § 2254 petition. In the original § 2254 petition's supporting facts for ground four—the argument alleging prosecutorial misconduct—Anderson recites in the second paragraph the same facts regarding O'Shea's testimony and the alleged *Brady* violation that he relies on in his supplemental § 2254 petition. Anderson's supplemental § 2254 petition relates back to his original § 2254 petition.

The state next contends that, even if the supplemental § 2254 petition related back to Anderson's original § 2254 petition, Anderson procedurally defaulted his claims in the supplemental § 2254 petition. The state is correct as with regard to Anderson's claims that (1) the state court erred in denying Anderson a hearing on his postconviction petition pursuant to

725 Ill. Comp. Stat. 5/122-1 and that (2) the state court should have granted Anderson a new trial based on newly discovered evidence under 735 Ill. Comp. Stat. 5/2-1401. Anderson's arguments with regard to those two claims are based on state law, not federal, and are not cognizable in federal habeas corpus proceedings. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (matters of state law are outside the purview of federal habeas corpus). The state's view that the Illinois Appellate Court decided Anderson's *Brady* ground on an independent and adequate state procedural ground is misguided. The Illinois Circuit Court determined that the *Brady* claim was untimely, but addressed its merits in the alternative. The Illinois Appellate Court, whose reasoning this court ultimately reviews as the last state court to issue an opinion, discussed only the merits of the *Brady* claim when affirming the Illinois Circuit Court. Because the Illinois Appellate Court did not dismiss Anderson's claim on an independent and adequate state procedural ground, this court reviews the merits of the *Brady* claim. *See Timberlake v. Davis*, 409 F.3d 819, 821 (7th Cir. 2005); *Page v. Frank*, 343 F.3d 901, 905 (7th Cir. 2003).

2. Original § 2254 Petition

Anderson, according to the state, also procedurally defaulted one of the claims in his original § 2254 petition, that the state court erred in instructing the jury on accountability liability, for failure to fully and fairly present the arguments to each level of the state court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Anderson did not include in his initial petition for leave to directly appeal his conviction and sentence to the Illinois Supreme Court any argument regarding the trial court's reading of the accountability instruction. Nor did Anderson argue to this court cause and prejudice for this failure. Where the petitioner has failed to present his federal claim to the state courts and no longer can, the claim is procedurally defaulted. *See*

*Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). In addition the argument regarding the accountability instruction is procedurally defaulted because Anderson premised the argument only on state law grounds before the state court and did not present to the state court any federal constitutional grounds. *See Harding v. Sternes,* 380 F.3d 1034, 1046 (7th Cir. 2004); *Rodriguez v. Scillia*, 193 F.3d 913, 916 (7th Cir. 1999) (for a federal constitutional claim to be cognizable, a petitioner first must argue that theory in state court, rather than relying solely on a state law ground*)*.

B. Merits of Anderson's Original and Supplemental § 2254 Petitions

Moving to the merits of Anderson's original and supplemental § 2254 petitions, the court first addresses Anderson's arguments regarding the allegedly suggestive line-up, the introduction of gang evidence, and the claim of ineffective assistance of counsel. The court will last address the claims of prosecutorial misconduct, including the alleged *Brady* violation raised in Anderson's supplemental § 2254 petition.

1. Line Up

Turning first to Anderson's argument about the line up, Anderson argues that the state trial court's decision to allow testimony about Adasiak's identification of Anderson from the line up was a violation of due process because the line up was unduly prejudicial and suggestive. In a related argument that the court addresses with Anderson's claim that the line up was suggestive and unduly prejudicial, Anderson accuses the prosecutors of prohibiting Bigeck from testifying at the suppression hearing that Anderson was not wearing a White Sox starter jacket the day of the shooting. As a result of this alleged manipulation of the evidence, Anderson asserts that he did not receive a fair hearing regarding identification procedure. While Anderson reiterates the

11

basis of his general argument that the line up was improper, Anderson does not identify a specific error made by the state appellate court other than to state that the decision was contrary to or an unreasonable application of established federal law.

A police line up violates due process when its unduly suggestive nature infringes upon defendant's right to a fundamentally fair trial. *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006). The constitutional violation does not stem from the line up, but the erroneous evidentiary admission of the identification of the line up at trial. *Id.* Evidentiary errors only rise to a habeas corpus violation where the erroneous ruling is so prejudicial as to deprive the petitioner of the due process right to a fundamentally fair trial, or in other words there is a significant likelihood, based on the error, that an innocent person has been convicted. *Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001). Determining whether the state court's evidentiary admission of an identification from a line up violates due process is a two-part analysis. *See Abrams v. Barnett*, 121 F.3d 1036, 1041 (7th Cir. 1996). The court first assesses whether the line up was unduly suggestive. *Id.* Second, the court looks to the totality of the circumstances of the identification to determine if the identification is sufficiently reliable to satisfy due process. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). These factors include the opportunity of a witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the confrontation and the crime. *Id.*; *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

In upholding the state trial court's decision to admit the identification by Adasiak, the Illinois Appellate Court recited the proper legal standard under established federal law and

concluded that, while the line up was "clearly improper," the trial court did not error in admitting the identification given the totality of the circumstances. (Resp. Br. Ex. C at 9.) The factors cited by the Illinois Appellate Court in support of the reliability of the identification were Adasiak's immediate recognition of Anderson in the line up 13 hours after the shooting, Adasiak's testimony that he clearly saw Anderson's face and remembered Anderson from an altercation four days prior, and Adasiak's refusal to identify Bigeck based solely on the Notre Dame jacket because Adasiak did not see Bigeck's face during the shooting. (*Id.*) Additionally, because the court recognized that forcing Anderson to wear the White Sox jacket was improper and analyzed the totality of the circumstances to determine whether Adasiak's identification was reliable, the clothing Anderson wore the day of the shooting was not relevant to the admission of the identification. Thus, testimony by Bigeck during the suppression hearing (as opposed to the trial) that Anderson did not wear a White Sox jacket the day of the shooting would not be relevant to the trial court's admission of the identification. The Illinois Appellate Court applied the factors identified by the Supreme Court to the circumstances of this case and its decision that the identification from the improper line up was still reliable was not an unreasonable application of the clearly established federal law. At this stage in the litigation, the court does not ask what decision the court would have made in the first instance. Rather, the court's review is limited to whether the state appellate court's decision was objectively reasonable and the court concludes that it was.

2. Evidence of Gang Membership

Anderson next asserts that admission at his trial of allegedly prejudicial gang-related evidence violated due process. The evidence at issue was the testimony of a gang specialist who

13

identified Adasiak and Anderson as belonging to gangs. Again, Anderson generally asserts that the Illinois Appellate Court decision on this issue was contrary to and an unreasonable application of established federal law, but Anderson does not cite to any specific reasoning of the Illinois Appellate Court that was erroneous.

As a threshold matter, the court points out that Anderson procedurally defaulted this claim by failing to present it to the Illinois Supreme Court in his petition for leave to directly appeal the Illinois Appellate Court's December 29, 2001 decision. *See O'Sullivan*, 526 U.S. at 845. The state, however, does not raise this argument in its answer, and has thus forfeited it. *See Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005).

Turning to the substantive law, whether to admit evidence of gang involvement is based on whether the probative value of the evidence outweighs its prejudicial effect. Gang affiliation is admissible where the relationships among people in the case are a central issue. *See United States v. Richmond*, 222 F.3d 414, 417 (7th Cir. 2000).

In upholding the state trial court's admission of gang-related evidence, the Illinois Appellate Court noted that gang membership was relevant to the motive for the shooting and that the state trial court was careful to exclude unnecessary evidence relating to Anderson's gang affiliation, such as his defacing the police interrogation room with gang graffiti and a photograph of a gang tattoo on his abdomen. There is little doubt that the gang affiliations of Adasiak and Anderson were directly relevant to the shooting in that the rivalry supplied a motive for the offense. The state's theory of motive for the shooting could not have been established without the admission of the individual's gang affiliations. Still, the state trial court limited the prejudicial effect of the gang-related evidence where possible. The state court's decision to

uphold the admission of the gang-related evidence was proper. Not only does Anderson fail to establish that there was any evidentiary error, but also Anderson does not establish the high threshold necessary for a due process violation based on an evidentiary decision that there was significant chance that an innocent man was convicted.

3. Ineffective Assistance of Counsel

Anderson also raises a somewhat undeveloped ineffective-assistance-of-counsel argument premised on the application of an Illinois statute mandating a term of life imprisonment without consideration of mitigating factors where a defendant has been convicted of first degree murder of multiple victims, *see* 730 Ill. Comp. Stat. 5/5-8-1(a)(1)(c)(ii) (hereinafter "Mandatory Life Statute"). Anderson argues that his counsel rendered ineffective assistance, asserting that as a result of the Mandatory Life Statute, his attorney failed to present at sentencing mitigating factors that could have reduced Anderson's sentence.[3] From what the court can discern, Anderson further contends that had his counsel presented mitigating evidence, the sentencing court may have considered it, citing to *People v. Miller*, 781 N.E.2d 300, 338-41 (Ill. 2002). In *Miller*, the Illinois Supreme Court held Illinois's Mandatory Life Statute, to be unconstitutional under 8th Amendment as applied to a juvenile convicted of first degree murder of multiple victims on the accountability liability theory for acting as a lookout.

First recognizing that the Mandatory Life Statute has "withstood repeated attacks as to its

---

[3]The court does not consider this argument to raise a denial of assistance claim under *United States v. Cronic*, 466 U.S. 648 (1984). Counsel for Anderson does not cite to *Cronic* in any of his materials. Additionally, in Anderson's brief to the Illinois Appellate Court, counsel for Anderson cites to the two-part test articulated in *Stickland v. Washington*, 466 U.S. 668 (1984), in which a defendant must prove that his attorney's performance fell below an objectively reasonable standard and that the defendant was prejudiced as a result.

15

constitutionality," the Illinois Appellate Court held that Anderson's "right to effective assistance of counsel has not been abridged by the mandate of the statute as there are no mitigating factors which could ever be presented which may impact upon defendant's sentence, regardless of the competency of counsel." (Resp. Br. Ex. C. at 26-27.) The Illinois Appellate Court's analysis is not an unreasonable application of the right to effective assistance of counsel defined in *Strickland*. The Mandatory Life Statute does not provide the opportunity for counsel to present mitigating evidence and thus the performance of Anderson's counsel in not presenting such evidence could not fall below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. Nor could Anderson establish prejudice in that there is a reasonable probability that but for counsel's failure to present mitigating evidence the outcome of the sentencing would have been different. *Id*. at 694. Even if counsel had presented evidence of mitigating factors, the sentencing court would have only considered that mitigating evidence if the sentencing court determined that Mandatory Life Statute was unconstitutional on its face or unconstitutional as applied to Anderson's circumstances. The Illinois Appellate Court noted that the statute had withstood constitutional scrutiny and considered Anderson's circumstance no different than *People v. Taylor*, 464 N.E.2d 1059, (Ill. 1984), which upheld the statute's prima facie and as applied constitutionality. Furthermore, unlike *Miller*, the case cited by Anderson to this court, Anderson's role in the shooting was far greater than that of a lookout. In any event, Anderson did not present to the state court an argument that the Mandatory Life Statute was unconstitutional either on its face or applied to his circumstances. Without an argument that the statute is unconstitutional, the state sentencing court would have applied the Mandatory Life Statute and not considered any mitigating factors regardless of counsel's conduct.

16

4. Prosecutorial Misconduct

a. Closing Argument

Finally, Anderson raises several arguments alleging prosecutorial misconduct in violation of his due process rights. The court addresses each issue, starting with Anderson's contention that the prosecutor's statements in his closing arguments violated Anderson's right to a fair trial. Anderson challenges two assertions by the prosecutor. According to Anderson, the prosecutor first insinuated that the counsel for the defendant was "somehow engaged in improper, unethical, or illegal participation in the manufacturing or tampering with evidence with respect to the White Sox Starter jacket." (Pet. § 3(1)(D).)

For a claim of prosecutorial misconduct in the closing argument, the court first determines whether the challenged comments were improper, and then evaluates whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations and citations omitted). The analysis takes into account six factors: (1) whether the prosecutor misstated the evidence; (2) whether the remarks implicate the specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Ruvalcaba*, 416 F.3d at 565.

As applied to Anderson's trial, the court agrees with the decision by the Illinois Appellate Court that counsel for Anderson invited the comments. As stated by the Illinois Appellate Court,

> "[i]t was the defense counsel's theory, throughout the trial, that the lineup process was corrupted by the police . . . Defendant's closing arguments were a summation of evidence adduced at trial which supported that theory and we conclude the prosecution's comments were clearly invited by the presentation of that defense." (Resp. Br. Ex. C at

14.)

Although the invited response of the prosecutor does not excuse improper comments, the court looks at the trial as a whole and determines that the Illinois Appellate Court's conclusion that Anderson was not prejudiced was not contrary to nor an unreasonable application of clearly established federal law. *See Darden*, 477 U.S. at 182; *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001).

Anderson also challenges the prosecutor's statement in his closing arguments that he has an obligation to "'two people whose voices you'll never hear . . . Not to the rest of the People of the State of Illinois, even though I'm supposed , there's some people out there I do not care to represent.'" (Resp. Br. Ex. C at 14.) According to Anderson, this statement unconstitutionally shifted the burden of proof from the prosecutor to the defendant. The Illinois Appellate Court first noted that Anderson failed to object to this statement at trial and thus waived the argument, and alternatively suffered no prejudice from the statement because it did not have the effect of shifting the burden of proof. The conclusion that Anderson waived the argument is an independent and adequate state ground that precludes federal habeas corpus review. *See Miranda v. Leibach*, 394 F.3d 984, 991-92 (7th Cir. 2005). In any event, this court also does not see how the prosecutor's statement would amount to a shift in the burden of proof.

b. *Brady* claims

Lastly, in both his original and supplemental § 2254 petitions, Anderson raises a *Brady* violation against the state with regard to O'Shea's testimony. Anderson first argues in his original § 2254 petition that the state failed to disclose that O'Shea claimed no recollection of the events of December 14, 1995 as late as two weeks before Anderson's trial. Additionally, in

his supplemental § 2254 petition, Anderson contends that O'Shea committed perjury at Anderson's trial, as evidenced by his recantation of his testimony against Sopron, and the prosecutors, specifically Cassidy, knowingly suborned O'Shea's perjury. Anderson bases his claim that prosecutors knowingly suborned perjury on O'Shea's recantation of his testimony at Sopron's trial, in which O'Shea stated that he felt pressured and threatened by Cassidy to perjure himself or face charges that he murdered the two girls.[4]

For a claim under *Brady*, a defendant must show that (1) that the evidence was favorable to him because it was either exculpatory or impeaching; (2) that the government either willfully or inadvertently suppressed the evidence; (3) that as a result the prejudice ensued. *Banks v. Dretke,* 540 U.S. 668, 691 (2004); *United States v. Price*, 418 F.3d 771, 784 (7th Cir. 2005).

Illinois Appellate Court rejected Anderson's *Brady* claim both times Anderson presented it, on direct appeal and during his postconviction proceedings, holding that Anderson could not establish prejudice. On direct appeal, the Illinois Appellate Court agreed with the trial court that the other evidence in the trial "was so overwhelmingly indicative of guilt, O'Shea's testimony was immaterial." (Resp. Br. Ex. C. at 21.) In the summary order affirming the state circuit court's dismissal of Anderson's postconviction petition, the Illinois Appellate Court also held that O'Shea's alleged incantation would not have affected the outcome. (Resp. Br. Ex. K at 2-3, *People v. Anderson*, No. 1-04-1534, (Ill. App. Ct. July 22, 2005).) Elaborating on this point, the Illinois Appellate Court emphasized that O'Shea had recanted only his testimony at Sopron's

---

[4]To the extent that Anderson cites the affidavits of Edward Morfin and Gizowski recanting testimony about the shooting in his supplemental § 2254 petition, Anderson never identifies any statements made by Edward Morfin or Gizowski that were used against Anderson or whether Edward Morfin even testified against Anderson at his trial. Moreover, Anderson does not develop claim regarding their affidavits.

trial that Sopron ordered the shooting and not his testimony that he had seen Anderson and Bigeck that day with guns Anderson and Bigeck claimed were stolen. (*Id.*) The Illinois Appellate Court explained that at best the recantation affects O'Shea's credibility but the recantation does not undermine the other testimony that Anderson was the shooter at the scene of the offense. (*Id.*) Based on the overwhelming evidence presented at Anderson's trial, this court agrees with the Illinois Appellate Court and determines that the Illinois Appellate Court's application of *Brady* was not unreasonable. Several other witnesses beside O'Shea corroborated that Anderson and Bigeck were seen with guns they claimed were stolen on December 14, 1995 before the shooting. Furthermore, both Bigeck and Adaliak identified Anderson as the shooter. Anderson has not established that the knowledge of O'Shea's recantation would have affected the outcome of the trial. .

## CONCLUSION

Accordingly, Eric Anderson's original and supplemental petitions for habeas corpus relief under 28 U.S.C. § 2254 (Dkt. Nos. 1 & 6) are denied.

ENTER:

                                                          *[signature]*
                                                          JAMES F. HOLDERMAN
                                                          Chief Judge, United States District Court

Date: August 10, 2006